# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

--------

Argued September 16, 2004          Decided July 22, 2005

No. 03-1293

Polygram Holding, Inc., et al.,
Petitioners

v.

Federal Trade Commission,
Respondent

--------

On Petition for Review of an Order of the
Federal Trade Commission

--------

*Bradley S. Phillips* argued the cause for petitioners. With him on the briefs were *Glenn D. Pomerantz* and *Stephen E. Morrissey*.

*John F. Daly*, Deputy Special Counsel for Litigation, Federal Trade Commission, argued the cause for respondent. With him on the brief were *Michele Arington*, Attorney, *Susan A. Creighton*, Director, and *Richard B. Dagen*, Assistant Director.

Before: GINSBURG, *Chief Judge*, and EDWARDS and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

*Ginsburg*, CHIEF JUDGE: PolyGram Holding, Inc. and several of its affiliates petition for review of an order of the Federal Trade Commission holding PolyGram violated § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. As detailed below, PolyGram entered into an agreement with Warner Communications, Inc. to distribute the recording of a concert to be given by "The Three Tenors" in 1998. The two companies later entered into a separate agreement to suspend, for ten weeks, advertising and discounting of two earlier Three Tenors concert albums, one distributed by PolyGram and the other by Warner. The Commission held the latter agreement unlawful and prohibited PolyGram from entering into any similar agreement in the future. We agree with the Commission that, although not a *per se* violation of antitrust law, the agreement was presumptively unlawful and PolyGram failed to rebut that presumption. We therefore deny PolyGram's petition for review.

## I. Background

Here are the facts as found by the Commission in its order and opinion of July 28, 2003. *See In re PolyGram Holding, Inc.*, Docket No. 9298 (FTC), 2003 WL 21770765, available at http://www.ftc.gov/os/2003/07/polygramopinion.pdf (hereinafter, FTC Op.). The Three Tenors — José Carreras, Placido Domingo, and Luciano Pavarotti — put on spectacular concerts coinciding with the World Cup soccer finals in 1990, 1994, and 1998. PolyGram distributed the recording of the 1990 concert, which became one of the best-selling classical albums of all time. FTC Op. at 5–6. Warner distributed the 1994 concert album, which also met with great success. Both albums remained on the top-ten classical list throughout 1994, 1995, and 1996. *Id*. at 6.

In late 1997 PolyGram and Warner agreed jointly to distribute the recording of The Three Tenors' July 1998 concert. Warner, which had the worldwide rights, retained the United States rights but licensed to PolyGram the exclusive right to distribute the 1998 album outside the United States, and the companies agreed to share equally the worldwide profit or loss on the project. FTC Op. at 8. The agreement also obligated PolyGram and Warner to consult with one another on all "marketing and promotional activities" for the 1998 concert album, but each company was free ultimately to pursue its own marketing strategy and to continue exploiting its earlier Three Tenors concert album without limitation. The agreement also provided that PolyGram and Warner would collaborate on the distribution of any future Three Tenors album released through August 2002. *Id*.

Representatives of PolyGram and Warner first met in January 1998 to discuss "marketing and operational issues." One of PolyGram's representatives voiced concern about the effect of marketing the earlier Three Tenors albums upon the prospects for the 1998 concert album and suggested the two companies impose an "advertising moratorium" surrounding the 1998 release, which was scheduled for August 1. According to notes of their next meeting (in March) PolyGram and Warner representatives agreed that "a big push" on the earlier albums "shouldn't take place before November 15." After that meeting, each company instructed its affiliates to cease all promotion of the 1990 and 1994 Three Tenors albums for approximately six weeks, beginning in late July or early August. FTC Op. at 8.

Apparently Warner's overseas division did not get the message because in May it announced an aggressive marketing campaign, scheduled to run through December, to discount and to promote the 1994 album throughout Europe. When

PolyGram learned of this, it threatened to "retaliate" by cutting the price of its 1990 album. Accusations then flew between the two companies about which had started the imminent price war. Meanwhile, in June the promoter of The Three Tenors concert informed PolyGram and Warner that the repertoire for the 1998 concert would substantially overlap those of the 1990 and 1994 concerts, which in the view of both PolyGram and Warner executives jeopardized the commercial viability of the forthcoming concert album. FTC Op. at 8–9.

By the time The Three Tenors performed in Paris on July 10, PolyGram and Warner had exchanged letters reaffirming their commitment to suspend advertising and discounting the 1990 and 1994 concert albums and agreeing the moratorium would run from August 1 through October 15. About a week later, however, PolyGram's Senior Marketing Director, who had passed on the details of the agreement to PolyGram's General Counsel, sent a memorandum around the company stating, "Contrary to any previous suggestion, there has been no agreement with [Warner] in relation to the pricing and marketing of the previous Three Tenors albums." Warner followed suit on August 10, sending a letter to PolyGram repudiating any pricing or advertising restrictions relative to its 1994 album. At the same time, however, PolyGram and Warner executives privately assured one another their respective companies intended to honor the agreement, and in fact the companies did substantially comply with the agreement through October 15, 1998. FTC Op. at 9.

In 2001 the Commission issued complaints against PolyGram and Warner charging that, by entering into the moratorium agreement, the companies had engaged in an unfair method of competition in violation of § 5 of the FTC Act. Warner soon consented to an order barring it from making any

similar agreement in the future.  FTC Op. at 3 n.3.  PolyGram contested the charge and, after a trial, an Administrative Law Judge ruled that PolyGram had violated § 5 and ordered PolyGram, like Warner, to refrain from making any similar agreement in the future.

The Commission affirmed the order of the ALJ.  After first observing (correctly) that the analysis under § 5 of the FTC Act is the same in this case as it would be under § 1 of the Sherman Act, 15 U.S.C. § 1, FTC Op. at 13 n.11, the Commission revived the analytic framework it had first announced *In re Massachusetts Board of Optometry*, 110 F.T.C. 549 (1988), which begins with the proposition that conduct "inherently suspect" as a restraint of competition — that is, conduct that "appears likely, absent an efficiency justification, to restrict competition and decrease output" — is to be presumed unreasonable.  FTC Op. at 22–24.  Only if the competitive harm wrought by the restraint is not readily apparent from the nature of the restraint itself, or the charged party offers a plausible competitive justification for the restraint, must the Commission, under this approach, engage in a more searching analysis of the market circumstances surrounding the restraint.  *Id*. at 29.

Here the Commission determined the agreement between PolyGram and Warner to prohibit discounts and advertising for a time was indeed "inherently suspect" because such restraints by their nature tend to raise prices and to reduce output.  FTC Op. at 35–40.  The Commission then looked to PolyGram to identify some competitive justification for the restraint.  *Id*. at 40.  PolyGram objected that the Commission must first offer some evidence the agreement actually harmed competition.  In any event, PolyGram argued, the agreement was justified because it prevented PolyGram and Warner, as distributors of the 1990 and 1994 albums, respectively, from free-riding upon

— and thereby diminishing — each other's efforts to promote the 1998 album; hence the restraints created an incentive for each company vigorously to promote the 1998 album and thereby increased output. The Commission rejected that purported efficiency justification as legally insufficient. In the Commission's view, the moratorium agreement could not have had any such procompetitive effect but instead simply shielded the 1998 concert album from the competition of the two earlier albums. *Id*. at 41–48.

Observing that under the analytic framework of *Mass. Board* it could have stopped there, the Commission nonetheless went on to rule that, even if PolyGram's efficiency justification were cognizable, the facts simply did not support it, FTC Op. at 50; indeed, the Commission found the moratorium had no effect upon the degree to which the companies promoted the 1998 album and did not make the joint venturers any more likely to release a future Three Tenors album. *Id*. at 56–57. Thus, upon closer inspection, the Commission confirmed its initial conclusion that the moratorium agreement was an unreasonable restraint of trade in violation of § 1 of the Sherman Act and, hence, an unfair method of competition in violation of § 5 of the FTC Act. *Id*. at 58.

## II. Analysis

PolyGram raises four objections to the decision of the Commission: First, the Commission should not have rejected the free-rider justification as legally insufficient because the moratorium agreement had a legitimate, procompetitive purpose reasonably related to the joint venture. Second, the Commission was required to show the restraints actually harmed competition before it could require PolyGram to proffer a competitive justification. Third, the Commission's findings concerning the

competitive impact of the restraint were not supported by substantial evidence. Finally, there is no danger the same conduct will recur, so the Commission's prohibitory remedy is unreasonable.

The Commission's findings of fact are conclusive if supported by substantial evidence. *See* 15 U.S.C. § 45(c). The legal issues are "for the courts to resolve, although even in considering such issues the courts are to give some deference to the Commission's informed judgment that a particular commercial practice is to be condemned as 'unfair.'" *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1987) (*IFD*).

The Supreme Court's approach to evaluating a § 1 claim has gone through a transition over the last twenty-five years, from a dichotomous categorical approach to a more nuanced and case-specific inquiry. In 1978, just before the transition began, the Court summarized its doctrine as follows:

> There are ... two complimentary categories of antitrust analysis. In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality — they are "illegal per se." In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts particular to the business, the history of the restraint, and the reasons why it was imposed.

*Nat'l Soc'y of Prof'l Eng'rs v. FTC*, 435 U.S. 679, 692 (1978).

Courts and commentators have recognized the trade-offs inherent in each category. *Per se* analysis, which requires courts to generalize about the utility of a challenged practice, reduces

the cost of decision-making but correspondingly raises the total cost of error by making it more likely some practices will be held unlawful in circumstances where they are harmless or even procompetitive. *See*, *e.g.*, *Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 344 (1982) ("For the sake of business certainty and litigation efficiency, we have tolerated the invalidation of some agreements that a fullblown inquiry might have proved to be reasonable"); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 1509c (2d ed. 2003) (observing that *per se* analysis "dispenses with costly proof requirements, such as proof of market power," but consequently "produces a certain number of false positives"). The converse — increased litigation cost but reduced cost of error — obtains under the rule of reason, which requires an exhaustive inquiry into all the myriad factors "bearing on whether the conduct is on balance anticompetitive or procompetitive." Donald F. Turner, *The Durability, Relevance, and Future of American Antitrust Policy*, 75 CAL. L. REV. 797, 800 (1987); *see* Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1, 12–13 (1984) ("When everything is relevant, nothing is dispositive .... Litigation costs are the product of vague rules combined with high stakes, and nowhere is that combination more deadly than in antitrust litigation under the Rule of Reason").

Since *Professional Engineers* the Supreme Court has steadily moved away from the dichotomous approach — under which every restraint of trade is either unlawful *per se,* and hence not susceptible to a procompetitive justification, or subject to full-blown rule-of-reason analysis — toward one in which the extent of the inquiry is tailored to the suspect conduct in each particular case. For instance, the Court did not hold unlawful *per se* an agreement limiting the number of football games each participating college could sell to television, which agreement was challenged in *NCAA v. Board of Regents*, 468

U.S. 85, 100 (1984) (recognizing but declining to apply doctrine that "[h]orizontal price-fixing and output limitation are ordinarily condemned as a matter of law under an 'illegal *per se*' approach"); or the refusal of an organization of dentists to provide x-rays to dental insurers, which was at issue in *IFD*, 476 U.S. at 458 ("Although this Court has in the past stated that group boycotts are unlawful *per se*, we decline to resolve this case by forcing the Federation's policy into the 'boycott' pigeonhole and invoking the *per se* rule") (citations omitted). *Compare*, *e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) (price-fixing *per se* unlawful); and *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959) (group boycott *per se* unlawful).

At the same time, however, in *NCAA* and *IFD* the Court did not insist upon the elaborate market analysis ordinarily required under the rule of reason to prove the defendant had market power and the restraint it imposed had an anticompetitive effect. *See NCAA*, 468 U.S. at 109–10 (rule of reason analysis unnecessary in light of district court's finding price and output not responsive to demand); *IFD*, 476 U.S. at 459 ("While this is not price fixing as such, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement"). The Court instead adopted an intermediate inquiry, since dubbed the "quick look," to evaluate horizontal restraints of trade. *See, e.g.*, Areeda & Hovenkamp, *Antitrust Law*, ¶ 1911a.

It would be somewhat misleading, however, to say the "quick look" is just a new category of analysis intermediate in complexity between "*per se*" condemnation and full-blown "rule of reason" treatment, for that would suggest the Court has moved from a dichotomy to a trichotomy, when in fact it has backed away from any reliance upon fixed categories and

toward a continuum. The Court said as much in *California Dental Association v. FTC*:

> The truth is that our categories of analysis of anticompetitive effect are less fixed than terms like "*per se*," "quick look," and "rule of reason" tend to make them appear. We have recognized, for example, that there is often no bright line separating *per se* from Rule of Reason analysis, since considerable inquiry into market conditions may be required before the application of any so-called "*per-se*" condemnation is justified.

526 U.S. 756, 779 (1999).

Rather than focusing upon the category to which a particular restraint should be assigned, therefore, the Court emphasized the basic point that under § 1 the essential inquiry is "whether ... the challenged restraint enhances competition." *Id*. at 779–80 (quoting *NCAA*, 468 U.S. at 104). In order to make that determination, a court must make "an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint," *id*. at 781, which in some cases may not require a full-blown market analysis. The Court continued:

> The object is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principle tendency of a restriction will follow from a quick (or at least quicker) look, in place of a more sedulous one. And of course what we see may vary over time, if rule-of-reason analyses in case after case reach identical conclusions.

*Id*.; c*f*. *United States v. Microsoft*, 253 F.3d 34, 84 (D.C. Cir. 2001) (declining to condemn *per se* tying arrangements

involving platform software products because there was "no close parallel in prior antitrust cases" and "simplistic application of per se tying rules carries a serious risk of harm").

In this case, as we have said, the Commission analyzed PolyGram's conduct under the legal framework it had devised in *Mass. Board* (1988), which it maintains is consistent with the Supreme Court's teaching of more than a decade later in *California Dental* (1999). FTC Op. at 28–29. The *Mass. Board* analysis proceeds in several distinct steps: First, the Commission must determine whether it is obvious from the nature of the challenged conduct that it will likely harm consumers. If so, then the restraint is deemed "inherently suspect" and, unless the defendant comes forward with some plausible (and legally cognizable) competitive justification for the restraint, summarily condemned. "Such justifications," the Commission explained, "may consist of plausible reasons why practices that are competitively suspect as a general matter may not be expected to have adverse consequences in the context of the particular market in question, or they may consist of reasons why the practices are likely to have beneficial effects for consumers." *Id*. at 29.

If the defendant does offer such an explanation, then the Commission "must address the justification" in one of two ways. First, the Commission may explain why it can confidently conclude, without adducing evidence, that the restraint very likely harmed consumers. *Id*. at 33–34. Alternatively, the Commission may provide the tribunal with sufficient evidence to show that anticompetitive effects are in fact likely. *Id*. at 33. If the Commission succeeds in either way, then the evidentiary burden shifts to the defendant to show the restraint in fact does not harm consumers or has "procompetitive virtues" that outweigh its burden upon consumers. *Id*. at 34 n.45.

PolyGram argues the Commission's framework conflicts with Supreme Court precedent by condemning a restraint that is not *per se* illegal without the Commission having to prove the restraint actually harms competition. According to PolyGram, "proof of actual anticompetitive effect (or market power as its surrogate) is required in *any* Rule of Reason case."

For reasons we have already explained, we reject PolyGram's attempt to locate the appropriate analysis, and the concomitant burden of proof, by reference to the vestigial line separating *per se* analysis from the rule of reason. *See* Areeda & Hovenkamp, *Antitrust Law*, ¶ 1511a ("judges and litigants too often assume erroneously that the classification, per se or rule of reason, necessarily determines what must or may be alleged and proved, made the subject of detailed findings, or submitted to the jury"). At bottom, the Sherman Act requires the court to ascertain whether the challenged restraint hinders competition; the Commission's framework, at least as the Commission applied it in this case, does just that.

We therefore accept the Commission's analytical framework. If, based upon economic learning and the experience of the market, it is obvious that a restraint of trade likely impairs competition, then the restraint is presumed unlawful and, in order to avoid liability, the defendant must either identify some reason the restraint is unlikely to harm consumers or identify some competitive benefit that plausibly offsets the apparent or anticipated harm. That much follows from the caselaw; for instance, in *NCAA* the Court held that a "naked restraint on price and output requires some competitive justification even in the absence of a detailed market analysis." 468 U.S. at 110. Similarly, in *IFD*, the Supreme Court ruled a horizontal agreement to withhold services could not be sustained because the dentists failed to advance any "credible argument"

that "some countervailing procompetitive virtue ... [redeemed] an agreement limiting consumer choice by impeding the 'ordinary give and take of the market place.'"  476 U.S. at 459; *see also California Dental*, 526 U.S. at 771 (remanding for closer look at challenged advertising restrictions after concluding they "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition").

Although the Commission uses the term "inherently suspect" to describe those restraints that judicial experience and economic learning have shown to be likely to harm consumers, *see* FTC Op. at 29, we note that, under the Commission's own framework, the rebuttable presumption of illegality arises not necessarily from anything "inherent" in a business practice but from the close family resemblance between the suspect practice and another practice that already stands convicted in the court of consumer welfare.  The Commission appears to acknowledge, as it must, that as economic learning and market experience evolve, so too will the class of restraints subject to summary adjudication. *See California Dental*, 526 U.S. at 781 (the ability of a court to draw "a confident conclusion about the principal tendency of a restraint ... may vary over time, if rule-of-reason analyses in case after case reach identical conclusions); *see also Broad. Music, Inc. v. CBS*, 441 U.S. 1, 9 (1979) ("it is only after considerable experience with certain business relationships that courts classify them as *per se* violations"). *See generally* INDUSTRIAL CONCENTRATION: THE NEW LEARNING (Harvey J. Goldschmid, H. Michael Mann, J. Fred Weston, eds., 1974).

That said, we have no difficulty with the Commission's conclusion that PolyGram's agreement with Warner in all likelihood had a deleterious effect upon consumers — unless, that is, PolyGram comes forward with some plausible

explanation to the contrary. An agreement between joint venturers to restrain price cutting and advertising with respect to products not part of the joint venture looks suspiciously like a naked price fixing agreement between competitors, which would ordinarily be condemned as *per se* unlawful. The Supreme Court has recognized time and again that agreements restraining autonomy in pricing and advertising impede the "ordinary give and take of the market place." *IFD*, 476 U.S. at 459; *see also NCAA*, 468 U.S. at 107 ("[r]estrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit"); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 364 (1977) (advertising "serves to inform the public of the availability, nature, and prices of products and services, and thus performs an indispensable role in the allocation of resources in a free enterprise system").

PolyGram's fate in this case therefore rests upon the plausibility of the sole competitive justification it proffered for the moratorium agreement, namely, that the restrictions on discounting and advertising enhanced the long-term profitability of all three concert albums and promoted the "Three Tenors" brand. According to PolyGram, each company was concerned the other would "free ride" on the promotional activities of the joint venture by promoting its own earlier concert album; as a result fewer Three Tenors albums would be sold overall and the joint venture would be less likely to create future products, such as a "greatest hits" album or a boxed set. Thus, PolyGram likens the moratorium agreement here to the restraint at issue in *Polk Brothers, Inc. v. Forest City Enterprises*, 776 F.2d 185 (7th Cir. 1985), where two potential retail competitors collaborated to build a store offering some of each company's products but agreed not to sell competing products at the new store. Because the restraint arguably promoted productivity and output by controlling each participant's ability to free-ride on the other's

15

promotional efforts, the court, rather than condemning the restraint summarily, went on to evaluate it under the rule of reason. *Id*. at 190.

At first glance PolyGram's contention has some force; the moratorium appears likely to have mitigated the "spillover" effects that could be expected to follow an aggressive launch of the 1998 album. Absent the moratorium, that is, a consumer, after learning of the new album through the joint venture's advertising, might decide that he would be just as happy with an older concert album, especially if the older album were then available at a discount. The "free-riding" to be eliminated by the moratorium agreement, however, was nothing more than the competition of products that were not part of the joint undertaking. Why not an agreement by which PolyGram and Warner would eliminate advertising and price competition on all their records for a time while they focused exclusively upon promoting the new Three Tenors album? The "procompetitive" justification PolyGram offers is "nothing less than a frontal assault on the basic policy of the Sherman Act." *Nat'l Soc'y of Prof'l Engineers*, 435 U.S. at 695.

To take the Commission's example, if General Motors were vigorously to advertise the release of a new model SUV, other SUV manufacturers would no doubt reap some of the benefit of GM's efforts. FTC Op. at 43. But that would not mean General Motors and its competitors could lawfully agree to restrict prices and advertising on existing SUV models in return for General Motors giving its rivals a share of its profit on the new model. Nor would an agreement to restrain prices and advertising on existing SUVs be lawful if General Motors were to release the new model SUV as a joint venture with one of its competitors. *Id.* at 45. A restraint cannot be justified solely on the ground that it increases the profitability of the enterprise that introduces the new product, regardless whether that enterprise is a joint

venture or a solo undertaking. And it simply does not matter whether the new SUV would have been profitable absent the restraint; if the only way a new product can profitably be introduced is to restrain the legitimate competition of older products, then one must seriously wonder whether consumers are genuinely benefitted by the new product. As the Supreme Court said in *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 649 (1980),

> in any case in which competitors are able to increase the price level or to curtail production by agreement, it could be argued that the agreement has the effect of making the market more attractive to potential new entrants. If that potential justifies horizontal agreements among competitors imposing one kind of voluntary restraint or another on their competitive freedom, it would seem to follow that the more successful an agreement is in raising the price level, the safer it is from antitrust attack. Nothing could be more inconsistent with our cases.

*See also Law v. NCAA*, 134 F.3d 1010, 1023 (10th Cir. 1998) ("While increasing output, creating operating efficiencies, making a new product available, enhancing service or quality, and widening consumer choice have been accepted by courts as justifications for otherwise anticompetitive agreements, mere profitability or cost savings have not qualified as a defense under the antitrust laws").

In sum, because PolyGram has failed to identify any competitive justification for its agreement with Warner to refrain from advertising or discounting their competitive Three Tenors products, we hold it violated § 5 of the FTC Act. Hence, we need not go on to determine whether the Commission's findings of fact concerning actual competitive harm are supported by substantial evidence.

Finally, we hold the remedy ordered by the Commission was reasonable. The Commission found there was a significant risk that, if not prohibited from doing so, PolyGram would enter into similar arrangements in the future. That determination is supported by substantial evidence. The record shows the condition that gave rise to the moratorium agreement — namely, the company "fear[ed] that a new release by one of [its] recording artists may lose sales to the artist's older albums owned by a competitor," FTC Op. at 59 — is a recurrent one in the record industry; therefore, PolyGram would have the same incentive in the future to enter into other agreements to restrain advertising and price discounting.

## III. Conclusion

For the foregoing reasons, PolyGram's petition for review is

*Denied.*