DYK, Circuit Judge,
with whom GAJARSA, Circuit Judge, joins, dissenting.
This case presents important questions concerning the scope of the doctrine of patent misuse. The critical question is whether the existence of an antitrust violation — in the form of an agreement to suppress an alternative technology designed to protect a patented technology from competition — constitutes misuse of the protected patents. The majority holds that it does not. This seems directly contrary to the Supreme Court’s view of pat-, ent misuse in its recent Illinois Tool Works decision, where the Court concluded that “[i]t would be absurd to assume that Congress intended to provide that the use of a patent that merited punishment as a felony [under the Sherman Act] would not constitute ‘misuse.’ ” Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 42, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006).
*1342 The majority declines to give the patent misuse doctrine significant scope because it “is in derogation of statutory patent rights against infringement.” Majority Op. at 1321. Evidently the majority thinks it appropriate to emasculate the doctrine so that it will not provide a meaningful obstacle to patent enforcement. Outside of unlawful tying arrangements and agreements extending the patent term, the majority would hold that antitrust violations are not patent misuse and would leave to private and government antitrust proceedings the task of preventing abuse of patent monopolies, enforcement that is likely inadequate to the task. Indeed, the majority goes so far as to suggest that the misuse doctrine be eliminated entirely. Id. at 1329 n. 2. I read the relevant Supreme Court cases and congressional legislation as supporting a vigorous misuse defense, clearly applicable to agreements to suppress alternative technology. The majority cabins the doctrine in contravention of this Supreme Court authority. I respectfully dissent.
I
U.S. Philips Corporation (“Philips”) commenced this proceeding alleging that Princo Corporation and Princo America Corporation (collectively, “Princo”) had infringed Philips’ Raaymakers patents.[1] Princo asserted a misuse defense. The overall issue is whether Philips has misused the asserted Raaymakers patents by (1) agreeing with Sony Corporation (“Sony”) to jointly license the Raaymakers patents together with the Lagadec patent[2] and providing, as part of that agreement, that the alternative technology embodied in the Lagadec patent will not be licensed in competition with the Raaymakers technology, and (2) securing an agreement from the licensees of the Raaymakers and Lagadec patents barring them from using the Lagadec patent to develop an alternative technology that would compete with the Raaymakers technology.[3] The majority holds that there is no patent misuse because the Lagadec patent has not itself been asserted in this proceeding, see id. at 1331, and, alternatively, because “Princo also failed to show that the asserted agreement had any anticompetitive effects because ... the Lagadec technology was not a viable potential competitor to the technology embodied in the Raaymakers patents,” id. at 1334.
The majority’s first holding — that the agreements cannot infect the Raaymakers patents — rests on the resolution of an issue that apparently never occurred to Philips nor the International Trade Commission (“ITC”) and was never briefed nor argued before the panel. When this case was before the panel, neither Philips nor the ITC urged that the failure to assert infringement of the Lagadec patent in the ITC proceedings barred a finding of patent misuse. The leading treatise on the interrelationship between patent law and antitrust law viewed the panel opinion here, holding the misuse doctrine applicable to agreements to suppress alternative technology, “as standing for the unexceptional proposition that patent licensing schemes are illegal where they are used as part of a broader effort to fix prices and restrict competition.” Herbert Hovenkamp et al., IP and Antitrust § 3.3g, at 3- *1343 42 to -43 (2d ed.2010); see Princo Corp. v. Int’l Trade Comm’n, 563 F.3d 1301, 1314-15 (Fed.Cir.2009). Now the court en banc holds that such agreements cannot constitute patent misuse. Contrary to the majority, the Supreme Court cases establish that license agreements that suppress alternative technologies can constitute misuse of the patents for the protected technology, and the regional circuits have agreed.
The majority’s second holding — that there is no misuse unless the accused infringer shows that the technology was, or would probably have become, commercially viable — is contrary to established patent misuse doctrine. That doctrine recognizes that antitrust violations may constitute misuse; that a presumption of anticompetitive effect flows from an agreement not to compete; and that the burden rests on the patent holder to justify such an agreement. Philips did not even attempt to make the required showing here.
II
At the outset, it is important to understand the extent to which the Raaymakers technology, incorporated into the so-called “Orange Book” standard and covered by the asserted patents, dominates the multibillion dollar market for recordable compact discs (“CD-Rs”) and rewritable compact discs (“CD-RWs”). The first compact disc (“CD”) was developed in the 1970s. Consumers could use the original CDs to play music and other recorded material, but they could not record data on the CDs. There was therefore a substantial demand for more advanced technologies that would enable the user to record and store data on reusable CDs. Philips initially acted alone in attempting to develop a technology for recordable CDs. Eventually Philips developed the CDR/RW technology with some assistance from a few of its competitors. CD-R technology allows consumers to purchase blank discs that they can fill with data. Similarly, CD-RW technology enables consumers to record, erase, and re-record data on discs. A key feature of CD-Rs and CDRWs is that they are compatible on all CD audio players and CD-ROM drives.
Philips created a patent pool for the CD-R/RW technology with its competitors and offered joint licenses for their patents. Although Sony Corp., Taiyo Yuden Co. Ltd., Ricoh, and Yamaha all contributed patents to the Orange Book patent pool, Philips has been the sole company responsible for administering the CD-R/RW licensing programs and for entering agreements to license the packages. Philips has charged a very substantial royalty to companies using the Orange Book standard. The royalty rate has ranged from one-half to two-thirds the manufacturers’ selling price for the discs. This has enabled Philips and the other members of the patent pool to collectively secure hundreds of millions, if not billions, of dollars in revenue from the sale of those discs.
Despite the high licensing fees for the Orange Book standard, Philips’ Orange Book standard achieved market dominance. The CD-R and CD-RW technologies have revolutionized the storage, use, and transfer of computer data, rapidly replacing the previous storage technology. In re Certain Recordable Compact Discs & Rewritable Compact Discs, No. 337-TA-474, slip op. at 386 (Int’l Trade Comm’n Oct. 24, 2003) (“Initial Determination”). By 2003 more than 100 manufacturers had received licenses to patents under the Orange Book standard. Billions of discs manufactured in accordance with this standard have been sold each year. Every CD-R or CD-RW disc now manufactured is produced according to the Orange Book standard. See id. at 390 (“All CD-Rs and CD-RWs sold in the marketplace must *1344 comply with Orange Book standards.”). All of the manufacturers in the United States, as well as in many other countries, are effectively required to license the Orange Book technology. As the ITC recognized in its Initial Determination, “[n]o one can manufacture or sell CD-R or CD-RW discs legally in the United States without taking a license to the Philips patents.” Id. And, “Philips has the power to exclude a company from entering the CDR or CD-RW market.” Id. at 393. “Philips has market power in the United States market for licensing essential U.S. patents for the manufacture of CD-R/RWs according to Orange Book standards because ... there are no close substitutes for CDR/RWs .... ” In re Certain Recordable Compact Discs & Rewritable Compact Discs, Inv. No. 337-TA-474, slip op. at 27 (Int’l Trade Comm’n Mar. 25, 2004) (“Final Determination ”). No competitive alternative to either the CD-R or CD-RW disc has been developed to the point of commercial viability.
However, Sony did in fact develop a potential alternative to a key aspect of the Orange Book technology covered by the Raaymakers patents. This technology is reflected in the Lagadec patent. Both the Raaymakers and Lagadec technologies are directed to solving a known problem necessary to record data on CDs. Specifically, during the course of developing the CD-R standard, Philips and Sony engineers realized they needed to identify ways to encode position data on the “blank” or unrecorded CD-R/RWs so that the recorder could determine where along the spiral pregroove track its laser was positioned at any given time, or “absolute time” position data.[4] Like the Lagadec technology, the Raaymakers technology encodes position data. The Lagadec and Raaymakers technologies differ in that Philips’ technology employs “frequency modulation,” an analog method of encoding information, whereas Sony’s technology employs a digital method.
Although the parties recognized that the Lagadec patented digital method had the potential to compete with the patented Raaymakers technology, Philips and Sony determined not to license the Lagadec patent as an alternative to the Raaymakers patents. Instead, they agreed as part of the overall Orange Book agreement not to license the Lagadec patent as a competitive technology. At the same time, the Philips licensing agreement for the Orange Book patent pool, which included the Lagadec patent, prohibited licensees (CD manufacturers) from using any of the patents for non-Orange Book purposes, thus precluding the licensees from developing alternatives to the Orange Book. Initial Determination, slip op. at 370 (“All of Philips’ CD-R and CDRW licenses contain a field of use provision limiting the license grant to use of the patents to manufacture ... CD-R or CD-RW discs that comply with the Orange Book Standard.”).
The rewards flowing to Sony from this series of agreements were considerable. In return for a minimal contribution to the Orange Book patent pool, Sony was rewarded a substantial portion of the royalties. For example, the Lagadec patent was the only essential Sony patent in the CD-RW pool.[5] For this contribution Sony received 36 % of the royalties under the *1345 CD-RW patent pool. Philips’ employees conceded that Sony employees “were more observers than real active developers of’ the CD-RW format. J.A. 1830 (testimony of Dr. Jacques Heemskerk); see also J.A. 3254 (explaining that the CD-RW format was “written in close coperation [sic] with Ricoh and with the passive support of Sony.”). The situation was not much different with respect to the CD-R pool where, out of eleven supposedly essential patents, only two of these were Sony patents, the Lagadec patent and Patent No. 5,126,994 (the “Ogawa” patent).[6] See, e.g., J.A. 3534-65, J.A. 6592-6636.
The effect of these agreements was to protect the Philips Raaymakers technology from any actual or potential competition. As no one could license the Lagadec patent outside of the Orange Book patent pool, the patent was rendered useless as an alternative technology.
III
Princo manufactures CDs covered by the Raaymakers and Orange Book patents. It declined to pay royalties on those patents. Philips initiated a proceeding before the ITC seeking to exclude Princo’s products from the United States pursuant to section 337(a)(1)(B) of the Tariff Act of 1930, 19 U.S.C. § 1337(a)(1)(B). Princo asserted a misuse defense. The ITC initially found misuse because of patent tying by Philips — the practice of tying patents essential to practicing the Orange Book to those that were not essential. Final Determination, slip op. at 4-5. We concluded that there had been no unlawful tying with respect to the patents then in question, and remanded for a determination of whether Philips had engaged in other activities that constituted misuse. U.S. Philips Corp. v. Int’l Trade Comm’n, 424 F.3d 1179, 1197-99 (Fed.Cir.2005). The ITC rejected Princo’s contention that including the Lagadec patent in the patent pool constituted improper tying (an issue not originally addressed) and that agreements not to license the Lagadec patent in competition with the Orange Book technology were also not misuse. The original panel opinion agreed that the ITC had properly rejected the Lagadec tying claim, but erred in rejecting the misuse claim based on the agreement not to license the Lagadec patent as an alternative technology. The panel remanded to determine whether such an agreement existed and whether there was an anticompetitive effect. The en banc court holds that the agreements not to license the Lagadec patent do not constitute misuse.[7] I disagree.[8]
IV
The majority first holds that even if the anticompetitive behavior alleged here constitutes patent misuse (an issue addressed in the next section), this conduct does not *1346 involve misuse of the asserted Raaymakers patents, but only of the Lagadec patent. The Raaymakers patents can thus be enforced. However, it is clear that if the Philips/Sony agreement and the Philips agreements with licensees constituted misuse, they constituted misuse of the Raaymakers patents. The agreements to suppress the Lagadec technology were not separate or collateral agreements, as the majority suggests, but were part and parcel of the same course of conduct designed to protect the Raaymakers patents from competition from the alternative Lagadec technology. That constitutes misuse of the Raaymakers patents.
Patent misuse is defined as extending the scope of a patent beyond the monopoly conferred by the patent laws. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 136, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). As the Supreme Court stated in United States v. Univis Lens Co., “the particular form or method by which the monopoly is sought to be extended is immaterial.” 316 U.S. 241, 251-52, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942).
As the majority points out, see Majority Op. at 1327-28, many of the misuse cases have involved assertions that the asserted patent was used to gain a broader monopoly by tying the licensing of patent rights to the purchase of an unpatented product or by agreeing to extend the patent term. See, e.g., Brulotte v. Thys Co., 379 U.S. 29, 33, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964); Transparent-Wrap Mach. Corp. v. Stokes & Smith Co., 329 U.S. 637, 644, 67 S.Ct. 610, 91 L.Ed. 563 (1947). The issue here is whether licensing agreements that are designed to protect patented technologies from competition and thereby extend their monopoly should fare any better. In holding that such licensing agreements do not constitute patent misuse, the majority ignores binding Supreme Court precedent.
The Supreme Court in Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 456-57, 60 S.Ct. 618, 84 L.Ed. 852 (1940), made clear that patent misuse occurs when patent licensing agreements are used “to control conduct by the licensee not embraced in the patent monopoly.” In United States v. United States Gypsum, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948), the Court explicitly held that the use of license agreements to fix prices and suppress competition from alternative technologies constituted patent misuse. There, U.S. Gypsum, which produced gypsum and gypsum products, found itself in a situation similar to Philips. It had acquired the “most significant” patents covering so-called closed edge boards. Id. at 368, 68 S.Ct. 525. It acquired additional significant patents from co-conspirators and licensed those patents to virtually the entire industry. The patented, closed edge boards competed with unpatented, open edge boards. U.S. Gypsum, companies that had assigned patents to U.S. Gypsum, and the other manufacturers licensed by U.S. Gypsum agreed to suppress competition from open edge boards and maintain higher prices by concertedly entering into industry-wide patent licensing agreements that effectively eliminated open edge boards from the market. The Court held that these licensing agreements to suppress competition violated the antitrust laws and constituted misuse of the closed edge board patents: “the testimony of the witnesses is ample to show that there was an understanding, if not a formal agreement, that only patented board would be sold. Such an arrangement in purpose and effect increased the area of the patent monopoly and is invalid.” Id. at 397, 68 S.Ct. 525. The Court explained that there is
no support for a patentee, acting in concert with all members of an industry, to issue substantially identical licenses to *1347 all members of the industry under the terms of which the industry is completely regimented, the production of competitive unpatented products suppressed, a class of distributors squeezed out, and prices on unpatented products stabilized.
Id. at 400, 68 S.Ct. 525. Contrary to the majority, Gypsum is not simply an antitrust case. The Gypsum case was specifically cited by the Supreme Court in Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation — the most recent Supreme Court articulation of patent misuse — as one of “the series of decisions in which the Court has condemned attempts to broaden the physical or temporal scope of the patent monopoly.” 402 U.S. 313, 343, 344 n. 40, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Gypsum, together with the panel decision in this case, has also been cited by the leading treatise to exemplify the point that agreements not to compete can constitute misuse of patents. Hovenkamp et al., supra, § 3.3g, at 3-42.
A number of courts have followed Gypsum and held that license agreements suppressing the manufacture or sale of competing goods constitute misuse of the licensed patents — whether the non-compete agreement binds the licensees or the licensor. One of these decisions is Compton v. Metal Products, Inc., 453 F.2d 38 (4th Cir.1971), a case explicitly rejected by the majority. See Majority Op. at 1331 n.4. In Compton, as part of a license agreement, the patent holder agreed not to compete with the licensee for a period of years. 453 F.2d at 44. In holding that this agreement constituted patent misuse, the Fourth Circuit explained that
the agreement falls outside the limited monopoly granted by the patent laws, because in exclusively licensing his patents, the patentee himself could neither require non-competition beyond the term of the patents nor as to items not covered by the patents. We think that by agreeing to restrictions on his own competition which he could not compel of others, the patentee has extended the monopoly granted by the patent laws beyond its legal bounds ....
Id. at 44-45 (citation omitted). Contrary to the majority, Compton does not represent an “expansive patent misuse theory,” see Majority Op. at 1331 n.4, but is consistent with the Supreme Court’s Gypsum case as well as other court of appeals cases that hold that license agreements not to compete constitute misuse of the licensed patents. See Berlenbach v. Anderson & Thompson Ski Co., 329 F.2d 782, 784 (9th Cir.1964) (holding that a non-competition clause in a patent license constitutes misuse without proof of substantial lessening of competition); Nat’l Lockwasher Co. v. George K. Garrett Co., 137 F.2d 255, 257 (3d Cir.1943) (finding misuse of a patent where patent licensees had agreed to “make and sell no form of non-entangling Spring Washers except such as are covered by said patent”); Krampe v. Ideal Indus., 347 F.Supp. 1384, 1387 (N.D.Ill.1972) (holding a non-competition clause in a patent licensing agreement binding the licensee not to sell competing products constitutes patent misuse); Park-In Theatres v. Paramount-Richards Theatres, 90 F.Supp. 730 (D.Del.1950) (holding a non-competition clause in a patent license agreement binding the licensee not to sell or promote competing products constitutes misuse), aff'd, 185 F.2d 407 (3d Cir.1950); see also SCM Corp. v. Xerox, 645 F.2d 1195, 1204 (2d Cir.1981) (“While ... a concerted refusal to license patents is no less unlawful than other concerted refusals to deal, in such cases [where the parties act in concert] the patent holder abuses his patent by attempting to enlarge his monopoly beyond the scope of the patent granted him.” (emphasis added)). Indeed, the leading treatise on patent law states that “prohibiting production or sale of *1348 competing goods” is a “classic act of misuse” and notes that the “courts have consistently taken the view that a provision in a patent license requiring a party not to deal in products that compete with the patented product constitutes misuse per se.” 6 Donald S. Chisum, Chisum on Patents § 19.04[3], [3][b], at 19-451, -463 (2010). If an agreement to suppress competition in an unpatented product to protect a patented product constitutes misuse, it is clearly misuse where the agreement involves the suppression of one patented technology to protect another patented technology from competition, as is the case here.
The same approach has been taken in copyright law where courts have found copyright misuse based on suppression of competing products. For example, in Lasercomb America, Inc. v. Reynolds, the Fourth Circuit held that the plaintiffs requirement in its standard licensing agreement forbidding the licensee and all its employees from developing any kind of software competitive with the plaintiffs application constituted misuse and rendered the copyrighted software unenforceable. 911 F.2d 970, 973, 979 (4th Cir.1990). The Ninth Circuit in Practice Management Information Corp. v. American Medical Association held that licensing a copyrighted product in exchange for an agreement not to use a competitor’s product constituted misuse and rendered the copyright unenforceable. 121 F.3d 516, 520-21 (9th Cir.1997). These cases establish that, regardless of the form of intellectual property involved, a party’s efforts to use its intellectual property to suppress a competitive product constitutes unacceptable misuse.
The majority attempts to distinguish Gypsum and apparently also its progeny by suggesting that they involve a single agreement, whereas here the non-compete agreements with respect to the Lagadec patent were independent of or collateral to the agreements with respect to the Raaymakers patents. See Majority Op. at 1332.
What the majority ignores is that the non-compete agreements here, as in Gypsum and the court of appeals misuse cases, are part and parcel of the agreements governing the asserted patents (here, the Raaymakers patents). The agreement between Philips and Sony with respect to the suppression of the Lagadec technology appears in the same letter agreement between Philips and Sony that provided for the pooling of their patents, including the Raaymakers patents, and the division of royalties.[9] The agreement between Philips and its licensees not to use the Lagadec technology in competition with the Raaymakers technology appears in the agreements licensing the Raaymakers technology. The overall effect of the two agreements was to prevent competitors from utilizing the alternative Lagadec technology and to protect the licensed Raaymakers patents from competition with the Lagadec technology. The licenses to the asserted patents were “eondition[ed] ... so as to control conduct by the licensee not embraced within the patent *1349 monopoly” of the asserted patents. See Ethyl, 309 U.S. at 456-57, 60 S.Ct. 618. The agreements with respect to Raaymakers and Lagadec cannot be treated separately, as the Supreme Court held in Gypsum and as the circuit courts held in the other cited cases. Nor is it significant that two separate agreements (the licensee agreements and the Philips/Sony agreement) are involved. In Gypsum itself, the agreements to suppress the competing open edge boards were in fact not even formally part of the license agreements, but were, treated together because they were directed to the same course of conduct. See U.S. Gypsum, 333 U.S. at 384-85, 68 S.Ct. 525. Thus, the agreement to promote the Raaymakers patents cannot be separated from the agreement to suppress the Lagadec patent.[10] This misconduct renders both the Raaymakers and Lagadec patents unenforceable.[11]
The majority alternatively suggests that the existence of an antitrust violation involving an agreement not to compete and the extension of the patent monopoly are not enough to establish misuse. Rather, misuse can only exist if there is an improper leveraging of the patent. In the majority’s view, “[w]hat patent misuse is about ... is ‘patent leverage,’ i.e., the use of the patent power to impose overbroad conditions on the use of the patent in suit that are ‘not within the reach of the monopoly granted by the Government.’ ” Majority Op. at 1331. While the misuse cases cited by the majority refer to patent leveraging, that is simply because leveraging of the patent — in tying and patent term extension cases — is a necessary part of the antitrust violation. Those cases do not suggest that leveraging is a necessary element where there is an agreement not to compete with the asserted patent. With one exception, Gypsum and the other court of appeals patent misuse cases discussed above did not rest on any finding of patent leveraging, but rather on the existence of an agreement not to compete that protected the asserted patents from competition. The one concerted action case that does mention leveraging simply assumes that leveraging is established by proof that the non-compete agreement was secured by compensating the licensee with a patent license. See Nat’l Lockwasher, 137 F.2d at 256. Here too the Orange Book licensees were in effect compensated for their agreement not to use Lagadec as an alternative to the Orange Book technology with a license to the Raaymakers patents, and *1350 Sony was compensated for its agreement not to license Lagadec for non-Orange Book uses by license fees from the Raaymakers patents. That is sufficient proof of leveraging if proof of leveraging is required at all in concerted action cases.
The majority suggests that asserting a patent misuse defense against the patent covering the suppressed technology (here, Lagadec) or an antitrust suit would provide a remedy for anticompetitive behavior. See Majority Op. at 1331, 1332, 1333-34 n.6. The clear ineffectiveness of both of these remedies demonstrates the importance of a misuse defense against the protected patents (here, the Raaymakers patents). There is no realistic prospect of securing a misuse determination with respect to the suppressed patent. This is because there is no need for Philips to assert the Lagadec patent and open itself to a misuse defense. The mere threat of an infringement suit is typically sufficient to prevent a potential competitor from devoting the resources necessary to develop an alternative technology; the technology is thus suppressed at the outset. So too a potential competitor (wishing to secure an advance determination of invalidity) has no remedy by way of declaratory judgment to secure a determination that the patent for the alternative technology is unenforceable given our jurisprudence demanding a showing of a concrete plan to enter the market as the condition for testing patent validity and enforceability. See, e.g., Benitee Austl., Ltd. v. Nucleonics, Inc., 495 F.3d 1340, 1346-47 (Fed.Cir.2007).
The antitrust laws also provide no adequate remedy for the suppression of competition. Private enforcement of the antitrust laws in this context is virtually impossible. Potential purchasers of the alternative product have no remedy.[12] The ability of even a competitor to sue for damages is highly problematic given the early stage of development of the Lagadec technology. And injunctive relief at the request of a competitor is unlikely to take effect in a time frame that would allow for the development of an alternative technology given likely litigation delays. The difficulty of securing a misuse determination with respect to the suppressed patent or traditional antitrust relief underscores the importance of applying the doctrine of patent misuse to the protected patents. Unless the protected patents are held unenforceable, there will be no adverse consequence to the patent holder for its misconduct nor will the patent misuse be remedied.
Contrary to the majority, the enactment of amendments to 35 U.S.C. § 271 in 1988 does not support the majority’s position. While the majority is correct that the legislation was designed to cabin the misuse doctrine, it did so only by making clear that some practices that did not constitute antitrust violations did not amount to misuse.[13] The legislation did not remotely suggest that antitrust violations did not constitute misuse. It is quite clear that Congress intended that the patent misuse doctrine could extend to a refusal to license patented technologies by parties acting in concert. In 1988, Congress enacted 35 U.S.C. § 271(d)(4), providing that no patent owner shall be deemed guilty of misuse by reason of having “refused to *1351 license or use any rights to the patent.” Pub.L. No. 100-703, § 201, 10 Stat. 4674, 4676 (1988) (codified at 35 U.S.C. § 271(d)(4)). The implication from the face of the statute is that an agreement not to license a patent could, however, be patent misuse, and the legislative history confirms what is plain from the language.
Congressman Kastenmeier, the author of this amendment, explained that “the underlying policy for [the misuse] doctrine has been an effort by the courts to prevent a person who has obtained a Government granted right to exclude competition from overreaching the scope of the patent.” 134 Cong. Rec. 32,294 (1988). He noted in particular that the misuse “doctrine has been applied to a wide variety of circumstances including ... use of covenants not to compete.” Id. at 32,294-95 (emphasis added).
Kastenmeier also stated that “Modification of the ‘refusal to use or license’ as not constituting patent misuse is consistent with the current caselaw and makes sense as a matter of public policy.” 134 Cong. Rec. at 32,295. He cited SCM in support of this proposition. Id. Significantly, the court in SCM explained that “[w]hile ... a concerted refusal to license patents is no less unlaroful than other concerted refusals to deal, in such cases [where the parties act in concert] the patent holder abuses his patent by attempting to enlarge his monopoly beyond the scope of the patent granted him.” 645 F.2d at 1204 (emphasis added). The legislative history thus confirms that an agreement to suppress a competitive patent, which would enlarge the patent holder’s monopoly beyond the scope of the patent, would constitute patent misuse.
As noted above, in Illinois Tool Works the Supreme Court in interpreting § 271(d) concluded that it would be “absurd” to suggest that Congress intended that agreements violating the Sherman Act would not constitute patent misuse. See Ill. Tool Works, 547 U.S. at 42, 126 S.Ct. 1281. In holding that Philips’ anticompetitive behavior cannot constitute patent misuse because the Lagadec patent was not asserted, the majority has significantly narrowed the patent misuse doctrine and has disregarded governing Supreme Court authority and congressional intent.
V
I turn next to the majority’s second holding that “even if Philips and Sony engaged in an agreement not to license the Lagadec patent for non-Orange-Book purposes, that hypothesized agreement ... did [not] have anticompetitive effects in the relevant market.” Majority Op. at 1340. This is so, according to the majority, because “[w]hat Princo had to demonstrate was that there was a ‘reasonable probability’ that the Lagadec technology, if available for licensing, would have matured into a competitive force in the storage technology market.” Id. at 1338. In addressing the issue of anticompetitive effects, we look to antitrust authorities. As the Chisum treatise recognizes, “[i]f a practice does rise to the level of an antitrust violation, it will also constitute misuse.” 6 Chisum, supra, § 19.04[2], at 19-442.[14] As noted earlier, this essential precept of patent misuse doctrine was confirmed by the Supreme Court in Illinois *1352 Tool Works. See 547 U.S. at 42, 126 S.Ct. 1281. Indeed, Supreme Court cases, as well as our own cases and other circuit cases, suggest the misuse doctrine should be broader than the antitrust prohibitions.[15] As we explained in C.R. Bard, Inc. v. MS Systems, Inc., “[p]atent misuse is viewed as a broader wrong than antitrust violation because of the economic power that may be derived from the patentee’s right to exclude. Thus misuse may arise when the conditions of antitrust violation are not met.” 157 F.3d 1340, 1372 (Fed.Cir.1998). The requirement of establishing an “anticompetitive effect” is necessarily satisfied by showing that the practice would violate the antitrust laws.
Significantly, neither the ITC nor Philips argued that the agreement would not violate the antitrust laws. See En Banc Oral Arg. at 27:03 — :08 (counsel for the ITC) (“Your honor ... that wasn’t an issue before the Commission.”); id. at 43:35 — :39 (counsel for Philips) (conceding that an arrangement between two companies to pool their patents, which were developed independently, and to set a standard “could be [an antitrust violation] under a particular [set of] facts or circumstances”).
Under antitrust analysis, an agreement such as that between Philips and Sony to suppress the Lagadec patent may appropriately be evaluated under the rule of reason. But even under the rule of reason, agreements between competitors not to compete are classic antitrust violations. See, e.g., United States v. New Wrinkle, Inc., 342 U.S. 371, 380, 72 S.Ct. 350, 96 L.Ed. 417 (1952) (“An arrangement was made between patent holders to pool their [competing] patents and fix prices on the products for themselves and their lieensees. The purpose and result plainly violate the Sherman Act.”); Standard Oil Co. (Ind.) v. United States, 283 U.S. 163, 175, 51 S.Ct. 421, 75 L.Ed. 926 (1931) (“[T]he primary defendants own competing patented processes for manufacturing an unpatented product ...; and agreements concerning such processes are likely to engender the evils to which the Sherman Act was directed.”).
Such anticompetitive behavior designed to foreclose competition from other technologies or increase prices has been a particular problem in the patent area because patents give competitors the legal right to foreclose competition. But while it is perfectly lawful for the owner of a patent to refuse to license it for any reason or no reason at all, see 35 U.S.C. § 271(d), this right does not extend to agreements among competitors. The Supreme Court recently confirmed that agreements between separate actors with respect to intellectual property licensing are invalid if they fail the rule of reason analysis. See Am. Needle, Inc. v. Nat’l Football League, -U.S.-, 130 S.Ct. 2201, 2206-07, 176 L.Ed.2d 947 (2010). And the Court has held that patent pooling agreements involving agreements not to compete violate the antitrust laws. See New Wrinkle, 342 U.S. at 380, 72 S.Ct. 350; Standard Oil, 283 U.S. at 175, 51 S.Ct. 421. Agreements not to compete are a matter of particular concern where, as here, the competitors collectively enjoy a monopoly position and set standards for an industry. Agreements between competitors to engage in standard setting may force an entire industry to adhere to a particular standard, effectively foreclosing competition from alternatives. Indeed, the Supreme Court *1353 has routinely condemned efforts to use standard-setting agreements to suppress competition of alternative products. See Am. Soc’y of Mech. Eng’rs v. Hydrolevel Corp., 456 U.S. 556, 571, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (cautioning that “a standard-setting organization ... can be rife with opportunities for anticompetitive activity,” which can give members “the power to frustrate competition in the marketplace” and harm competitors); Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 48-49, 33 S.Ct. 9, 57 L.Ed. 107 (1912). Most significantly, as the Supreme Court decision in Gypsum and the court of appeals cases cited earlier confirm, these basic principles apply in concerted action cases involving the suppression of alternative technology.
Despite this long history of condemning agreements to suppress competitive technologies, the majority holds that there was no misuse here. The majority recognizes that the Lagadec technology provided an alternative to the Raaymakers technology,[16] but the majority finds no misuse because Philips and Sony were involved in a joint venture and there has been no showing that the Lagadec technology was commercially viable or probably would have become so. The majority’s analysis of anticompetitive effects rests on three fundamental errors.
First, the majority errs in holding that the burden rests on the alleged infringer, Princo, to show anticompetitive effects. While the burden rests on Princo to show patent misuse in general and an antitrust violation in particular, Princo’s initial burden is satisfied by establishing the existence of an agreement to suppress a competitive technology. Where an agreement is considered “inherently suspect,” courts apply a “quick look” rule of reason analysis. An agreement is inherently suspect “[i]f, based upon economic learning and the experience of the market, it is obvious that a restraint of trade likely impairs competition.” Polygram Holding Inc. v. Fed. Trade Comm’n, 416 F.3d 29, 36 (D.C.Cir.2005). Under such an agreement, “no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.” NCAA v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 109, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (citations omitted). “[A]n agreement not to compete in terms of price or output” is inherently suspect. Id. The agreement to suppress the Lagadec patent, a competing technology, 'surely falls within this category. See Cal. Dental Ass’n v. Fed. Trade Comm’n, 526 U.S. 756, 769-71, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1991) (describing numerous cases in which the Supreme Court and the courts of appeals have applied the “quick look” analysis to anticompetitive agreements); En Banc Br. of Amicus Fed. Trade Comm’n 25 (“On its face, an agreement between Philips and Sony ... that the latter would withhold its technology from the market is ‘an agreement not to compete in terms of price or output.’ ” (quoting NCAA, 468 U.S. at 109, 104 S.Ct. 2948)).[17]
*1354 Competitive harm is thus presumed, and the burden falls on Philips to “come[] forward with some plausible (and legally cognizable) competitive justification for the restraint.” Polygram, 416 F.3d at 36; see NCAA, 468 U.S. at 110, 104 S.Ct. 2948 (“This naked restraint on price and output requires some competitive justification even in the absence of a detailed market analysis.”); id. at 113, 104 S.Ct. 2948 (“[Tjhese hallmarks of anticompetitive behavior place upon petitioner a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market.”); En Banc Br. of Amicus Fed. Trade Comm’n 25-26 (explaining that because the agreement with Sony to suppress the Lagadec patent was inherently suspect, the burden would be on Philips to show that the agreement was not anticompetitive).
Such justification “may consist of plausible reasons why practices that are competitively suspect as a general matter may not be expected to have adverse consequences in the context of the particular market in question, or ... may consist of reasons why the practices are likely to have beneficial effects for consumers.” Polygram, 416 F.3d at 36. “If no legitimate justifications are set forth, the presumption of adverse competitive impact prevails and ‘the court condemns the practice without ado.’ ” United States v. Brown Univ., 5 F.3d 658, 669 (3d Cir.1993) (quoting Chi. Prof'l Sports Ltd. P’ship v. NBA, 961 F.2d 667, 674 (7th Cir.1992)). Given the inherently suspect nature of the agreements to suppress the Lagadec technology, Princo has satisfied its burden, and Philips has the burden to establish a justification or lack of anti-competitive effects.[18]
Second, the majority appears to suggest that the “quick look” analysis should not apply and that Princo had the burden of demonstrating that the agreement to suppress the Lagadec technology could not be justified as part of the Philips/Sony joint venture agreement. See Majority Op. at 1334-37, 1339-40. While in theory procompetitive benefits from a joint venture could justify certain ancillary restraints in some circumstances, the burden remains on the party seeking to justify the restraint to establish precompetitive benefits. In fact, “joint ventures have no immunity from the antitrust laws.” NCAA 468 U.S. at 113, 104 S.Ct. 2948. The Supreme Court has recently made clear that otherwise anti-competitive agreements with respect to intellectual property are not justified simply because they are part of a joint agreement. In American Needle, a professional football league, its teams, and a corporate entity the teams formed to manage their *1355 intellectual property were sued by one of their licensees for allegedly violating § 1 of the Sherman Act, 15 U.S.C. § 1. 130 S.Ct. at 2206. The defendants asserted that their licensing activities were beyond the coverage of § 1 of the Sherman Act because they were collectively acting as a single entity. The Supreme Court disagreed, stating that “[t]he mere fact that the teams operate jointly in some sense does not mean that they are immune” from the antitrust laws. Id. at 2214.
Rather, a non-compete agreement arising out of a joint venture must still pass the rule of reason by providing some Mnd of justification, such as “where the agreement ... is necessary to market the product at all.” See Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 23, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); see also Am. Needle, 130 S.Ct. at 2216-17; Texaco, Inc. v. Dagher, 547 U.S. 1, 7, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006). But here, as in American Needle, “it simply is not apparent that the alleged conduct was necessary at all.” See Am. Needle, 130 S.Ct. at 2214 n. 7. Even if a joint venture were necessary to produce the CD-R/RW standard, it does not follow that concerted activity in marketing, and suppressing, intellectual property was necessary to produce the standard. See id.; Major League Baseball Props., Inc. v. Salvino, 542 F.3d 290, 339 (2d Cir.2008) (Sotomayor, J., concurring in the judgment) (“[A] restraint that is unnecessary to achieve a joint venture’s efficiency-enhancing benefits may not be justified based on those benefits.”); United States v. Visa U.S.A., 344 F.3d 229, 240-41 (2d Cir.2003); Law v. NCAA, 134 F.3d 1010, 1019 (10th Cir.1998). At oral argument before the panel, counsel for Philips conceded that he could think of no competitive justification for the restraint, and Philips has pointed to no record evidence that the suppression agreement was necessary to serve the joint venture’s legitimate goals.
The majority asserts that the agreement in question did no more than prevent Sony from competing with the joint venture, an agreement that the majority views as a legitimate ancillary restraint. See Majority Op. at 1334, 1336-37, 1339. There was no overall agreement that prevented Sony from competing with the joint venture, and the apparent agreement in 1993 to suppress Lagadec came well after the development of the Lagadec technology and its rejection for the Orange Book in 1987. There was, in short, no showing that suppression of Lagadec was necessary to achieve the joint venture’s legitimate goals. Moreover, the majority ignores the fact that the Raaymakers patents and the Lagadec patent in combination prevented others from competing without a patent license. The Philips agreement with its licensees barred all CD manufacturers from using Lagadec as a competitive technology, and the Philips/Sony agreement not only barred Sony from competing, but also barred Sony from authorizing others to do so. It is one thing for Philips and Sony to agree that Sony would not compete; it is quite another to use the patent monopoly to prevent anyone from utilizing a competitive technology to compete with the joint venture and thus to preserve Phillips’ virtual monopoly on recordable CD technology. Such agreements cannot be justified simply by relying on the legitimacy of non-compete agreements with the joint venture participants.[19]
*1356 Third, the majority holds that the suppression of an alternative technology violates the antitrust laws and constitutes misuse only if the technology is commercially viable or is shown to have a “reasonable probability” of commercial viability. Majority Op. at 1338-39. Quite apart from the majority’s error in placing the burden on Princo to show probable commercial validity, the probable commercial viability test itself finds no support in the case law or antitrust policy, as the amicus brief for the FTC makes clear.[20] It has been explicitly rejected in antitrust cases[21] and misuse cases as well. See, e.g., Berlenbach, 329 F.2d at 784. The reasons for this rejection are readily apparent. Apart from the joint venture rationale, there is, first, no procompetitive benefit from the suppression of potential competition, no matter how remote the possibility of success. As the majority purports to recognize, see Majority Op. at 1338, the antitrust laws are designed to protect not only full-fledged competition but also nascent competition. It is vitally important to protect competition from being stifled in its infancy. There is great difficulty in predicting commercial viability in the early stages of technological development, and indeed the patent system itself recognizes the importance of protecting technologies that have not yet reached the stage of commercial viability. There are numerous examples of technology that in the early stages of development were thought likely to fail but which eventually matured into successful commercial applications, including the electric light bulb, telephone, radio, telegraph, and television.[22] Moreover, even a flawed technology may provide competitive benefits. The Areeda and Hovenkamp treatise points out “the inquiry [into whether a given patent is superior or inferior] is rarely worthwhile, for even inferior technologies can provide some, even if not perfect, competition to the patentee.” 3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶7076, at 287 (3d ed.2008). In short, it “would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, *1357 albeit unproven, competitors at will — particularly in industries marked by rapid technology advance and frequent paradigm shifts.” Microsoft Corp., 253 F.3d at 79.
While it may be that proof by Philips that the Lagadec technology could never become commercially viable might be sufficient to defeat an antitrust violation, neither Philips’ proof nor the ITC’s findings reach that far. While Philips’ witness suggested that commercial development of the Lagadec technology could be difficult, he did not testify that these difficulties could not be overcome. Indeed, the record appears to contain some evidence of Lagadec’s potential. A 1986 Sony memorandum described the Lagadec proposal and indicated that potential solutions existed to some of the problems identified by Philips’ expert. The Lagadec patent as issued reflected these solutions. See, e.g., Lagadec patent col.6 11.47-52, col.7 11.54-58 (discussing band-limitation to eliminate disturbance at high and low frequencies). The ITC found only that the commercial viability of the Lagadec technology was “doubtful,” not that Philips had established that it could not be made commercially viable.
The majority’s strict standard fails to provide adequate protection against the suppression of nascent technology, and allows patent holders free rein to prevent the development of potentially competitive technologies except in the most extreme and unlikely circumstances. I respectfully dissent.

. U.S. Patent Nos. 4,999,825 and 5,023,856.

. U.S. Patent No. 4,942,565.

. I, like the majority, assume the existence of such an agreement between Philips and Sony, which is not denied by Philips. The agreement with the licensees was specifically found by the ITC. In the following discussion, for convenience, I treat both agreements as established fact. The majority misreads the dissent and the original panel opinion as limited to concerns about the Philips/Sony agreement. See Majority Op. at 1331, 1332, 1336-37.

. "Absolute time” refers to the fact that the laser’s location is expressed in terms of the time required to scan the spiral groove from the start of the disc to the current position.

. As explained in the panel opinion, the Lagadec patent was included in the patent pool because there was a concern that it might cover aspects of the Raaymakers technology, not because the Orange Book standard utilized the basic Lagadec technology. As noted, licensees were prohibited from using the Lagadec technology in competition with the Orange Book standard.

. The ALJ found that the Ogawa patent was improperly classified as essential given that economically viable alternatives to this patented technology existed outside the pool. Initial Determination, slip op. at 212-13. In its review, the ITC took no position on the ALJ's analysis of this patent. Final Determination, slip op. at 50-51.

. The majority does not disturb the original panel opinion’s ruling that the inclusion of the Lagadec patent in the patent pool did not constitute unlawful patent tying. The permissibility of including Lagadec in the pool does not answer the question of whether Philips could secure agreements from Sony and the licensees not to use the Lagadec technology for non-Orange Book purposes.

.While a remand to determine the existence of the Philips/Sony agreement under my view would still be necessary, even though Philips has not disputed the existence of that agreement, based on the subsequent briefing I am now convinced that there is no need for a remand on the issue of anticompetitive effects, as I discuss below.

. The parties entered into the letter agreement on September 7, 1993 (the "1993 agreement”). The 1993 agreement gave Philips an "exclusive right to license such Patent Rights ... for use in Articles listed in Appendix 2.” J.A. 3319. Appendix 2 lists "CD-WO” (i.e., CD-R) "Disc” and "Recorder.” Id. at 3321. That agreement further noted that "we confirm with respect to the aforementioned Patent Rights ... that we will license such Patent Rights outside the jointly agreed upon system standards only in cases which can reasonably be considered exceptional.” Id. at 3320. As noted earlier, both the majority and I assume for the purposes of this appeal that the agreement obligated Sony to refrain from licensing the Lagadec patent for any non-Orange Book purpose.

. Indeed, a similar issue was specifically addressed in Morton Salt Co. v. G.S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). In Morton Salt, the patent holder had licensed patents for a salt dispenser on condition that the licensees use only Morton's salt in the dispensers. Morton argued that the agreement with respect to the salt dispensers should be treated separately and that the anti-competitive conduct at most only rendered the salt purchase agreement unenforceable; it did not render the salt dispenser patent unenforceable. The Court in Morton Salt disagreed, holding that the salt dispenser patent was itself unenforceable. Id. at 492-94, 62 S.Ct. 402. Here, as in Morton Salt, the agreement with respect to the suppression of the Lagadec patent cannot be separated from the Raaymakers patents.

. The concurrence suggests that “at first blush there seems little difference between the agreement allegedly entered into here and Sony granting an exclusive license to Philips on the Lagadec patent, which Philips then decides not to practice." Concurring Op. at 1341. The difference here is two-fold: Philips did not on its own simply decide not to practice the Lagadec patent in competition with the Orange Book; Philips agreed with Sony that it would not do so. Philips and Sony also agreed not to grant manufacturers licenses to practice Lagadec in competition with the Orange Book. Thus, it was an agreement to suppress a potentially competitive technology from ever reaching the market. Such a license agreement clearly lies outside the bounds of the patent owner’s right to exclude others from using his or her invention.

. See generally Ill. Brick Co. v. Illinois, 431 U.S. 720, 728-29, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (prohibiting an indirect purchaser from suing a manufacturer to recover gains the manufacturer obtained by violating the antitrust laws).

. The one possible exception is the provision in § 271(d)(5) providing that tying is not misuse without a showing of market power. But the Supreme Court in Illinois Tool Works changed antitrust law to make it consistent with § 271(d). See 547 U.S. at 40-43, 126 S.Ct. 1281.

. As the ITC has recognized here, our court "has indicated that the rule of reason standard to be applied is that developed in antitrust law.” In the Matter of Certain Recordable Compact Discs and Rewritable Compact Discs, Inv. No. 337-TA-474, slip op. at 52 (Int’l Trade Comm'n Feb. 5, 2007) ("February 2007 ITC Determination ”); see also Hovenkamp et al., supra, § 3.2d, at 3-11 (explaining that the misuse analysis is "largely coextensive with antitrust doctrine”).

. See Zenith Radio, 395 U.S. at 140-41, 89 S.Ct. 1562 (explaining that the lower court could find patent misuse on remand even if the alleged conduct did not constitute an antitrust violation); Monsanto Co. v. Scruggs, 459 F.3d 1328, 1339 (Fed.Cir.2006) (quoting C.R. Bard, 157 F.3d at 1372); C.R. Bard, 157 F.3d at 1372; Practice Mgmt., 121 F.3d at 521; Lasercomb, 911 F.2d at 978; Senza-Gel Corp. v. Seiffhart, 803 F.2d 661, 668 (Fed.Cir.1986).

. See also Febmary 2007 ITC Determination, slip op. at 24 ("Lagadec constitutes, at best, a substitute technology....”).

. An inherently suspect restraint on competition requires no showing by the plaintiff of market power. See Cal. Dental, 526 U.S. at 779, 119 S.Ct. 1604 ("[A] challenge to a 'naked restraint on price and output’ need not be supported by 'a detailed market analysis’ in order to 'requirfe] some competitive justification’ ...(quoting NCAA, 468 U.S. at 110, 104 S.Ct. 2948)); Polygram, 416 F.3d at 36. If a restraint does not qualify as inherently suspect, the plaintiff will need to demonstrate anticompetitive effect either "indirectly by proving that the defendant possessed the requisite market power within a defined market or directly by showing actual anticompetitive effects." Law v. NCAA, 134 F.3d 1010, 1019 (10th Cir.1998); see Fed. Trade Comm’n v. Ind. Fed'n of Dentists, 476 U.S. 447, 460-61, *1354 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986); Hovenkamp et al., supra, § 30.3(b), at 30-10. Even if the agreements here are not inherently suspect, the ITC found that “Philips has market power in the United States market for licensing essential U.S. patents for the manufacture of CD-R/RWs according to Orange Book standards because ... there are no close substitutes for CD-R/RWs (ID at 160-64).” Final Determination, slip op. at 27. This ITC finding was sustained by our court in 2005. U.S. Philips Corp., 424 F.3d at 1186.

. The majority relies on various cases to support its theory that "Princo had the burden of showing that the hypothesized agreement had an actual adverse effect on competition in the relevant market.” See Majority Op. at 1338-39. However, none of these cases involved an agreement not to compete or suggested there is a burden on the challenging party to establish that inherently suspect agreements had actual anticompetitive effects in the marketplace under the "quick look” rule of reason analysis. For example, the majority relies on California Dental, 526 U.S. at 765, 119 S.Ct. 1604. But California Dental involved not simply an agreement not to compete, but an agreement not to engage in certain types of potentially deceptive advertising. That agreement has no resemblance to the non-compete agreements here.

. Nor is this a situation in which the Lagadec technology was jointly developed by Philips and Sony, as the majority suggests. See Majority Op. at 1334-36. In fact, the record is clear that the Lagadec technology was separately developed by Sony. See J.A. 943 (describing solutions for encoding position data developed by Sony and presented to Philips, including the Lagadec solution). Even after the Lagadec technology was rejected for the Orange Book standard, Sony continued to *1356 pursue the technology, and applied for a U.S. patent over seven months after the Raaymakers technology was adopted for the Orange Book and the Lagadec technology was rejected. As noted on page 1357, infra, the U.S. patent reflected improvements in the Lagadec technology.

. En Banc Br. of Amicus Fed. Trade Comm’n 23 ("[H]ere Princo need not prove that a licensee attempting to develop new technology using the Lagadec methodology actually would have succeeded in creating a technically and commercially viable technology that could have competed successfully against Philips' and Sony's Orange Book standard. Such a 'showing * * * is not an essential step in establishing that the [defendants'] attempt to thwart its achievement * * * was an unreasonable restraint of trade.' ” (quoting Ind. Fed'n, 476 U.S. at 461, 106 S.Ct. 2009)).

. See, e.g., Standard Oil Co. (Cal.) v. United States, 337 U.S. 293, 309-10, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949) (rejecting proof of the restrictive effect of alleged unlawful practices on competition because "what would have happened but for the adoption of the practice that was in fact adopted ... would be a standard of proof, if not virtually impossible to meet, at least most ill-suited for ascertainment by courts”); United States v. Microsoft Corp., 253 F.3d 34, 79 (D.C.Cir.2001) (en banc, per curiam) ("To require that [Sherman Act] liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant’s anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action.”).

.Christopher Cerf & Victor S. Navasky, The Experts Speak: The Definitive Compendium of Authoritative Misinformation 225-27 (Villard Books 1998) (1994). For instance, in 1878 the British Parliamentary Committee concluded that Thomas Edison’s electric light bulb was "good enough for our transatlantic friends ... but unworthy of the attention of practical or scientific men.” Id. at 225.